UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PAUL SIMKUS,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>UNITED AIRLINES,<br><br>　　　　　Defendant. | No. 13 C 4388<br><br>Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Paul Simkus alleges that his employer, United Airlines, retaliated and discriminated against him because he has attention deficit hyperactivity disorder ("ADHD") and other ailments, in violation of the Americans with Disabilities Act. R. 38. United has moved for summary judgment. R. 106. For the following reasons, United's motion is granted.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a

genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

### I.   Local Rule 56.1

Simkus filed this action pro se, R. 1, but four months later hired an attorney to represent him. R. 20. While represented, Simkus agreed to dismiss with prejudice claims hostile work environment, failure to accommodate, and ERISA claims he made in his pro se complaint, conceding that they were beyond the scope of his EEOC charge. *See* R. 27. Simkus's attorney then drafted first and second amended complaints on Simkus's behalf, R. 29; R. 38, and drafted a brief in opposition to United's motion to dismiss the second amended complaint. R. 34; R. 40. On April 30, 2014, the Court denied United's motion to dismiss the discrimination and retaliation claims at issue in this motion for summary judgment, but granted United's motion to dismiss Simkus's claim for intentional infliction of emotional distress. R. 43; R. 70. A little more than three months later on August 7, 2014, the Court granted Simkus's attorney's motion to withdraw his representation. R. 51.

Along with its motion for summary judgment, United filed the notice for pro se litigants required by the Local Rules, informing Simkus of his obligations in responding to a motion for summary judgment. R. 112. Simkus confirmed that he had received that notice at a hearing on November 6, 2015. R. 113.

Although Simkus timely filed a brief opposing United's motion, R. 114, Simkus failed to properly respond to United's statement of undisputed material facts as required by Local Rule 56.1. United asks the Court to deem Simkus to have admitted United's statements of facts, R. 115 at 3, because Local Rule 56.1(b)(3)(C) provides, "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." The Court agrees that Simkus has admitted United's factual allegations by failing to properly contest them. *See Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). United's summary judgment motion is granted on this basis alone. The Court is cognizant of the fact that Simkus filed his opposition brief pro se. But, as the Court discusses below, the facts described in United's statement are supported by competent evidence (primarily Simkus's deposition testimony), and Simkus's brief does not cite any contrary facts that are supported by competent evidence. Thus, even accepting Simkus's brief as a proper response to United's statement of material facts, Simkus has failed to demonstrate that there is a genuine dispute as to any material fact regarding United's liability.

## II. Simkus's Claims

Simkus has been employed by United since 1983, and he has held the position of Facilities Maintenance Mechanic for United at O'Hare Airport since April 2009. R. 109 ¶ 2. Simkus testified that he has been diagnosed with ADHD, anxiety disorder, depression, panic attacks, and sleep disorders. *Id.* ¶ 4. Simkus last worked for United in August 2012, and has been on "extended illness status" ("EIS")

since then. *Id.* ¶ 3. United employees are automatically placed in EIS when they have been absent from work for more than 16 consecutive calendar days. *Id.*

Between 2008 and 2009, prior to the events directly relevant to this lawsuit, Simkus filed four charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), which culminated in a lawsuit in this district filed on August 20, 2010, alleging race, age, and disability discrimination. R. 109 ¶ 15. The lawsuit was dismissed with prejudice for want of prosecution. *See Simkus v. United Air Lines, Inc.*, No. 10 C 5274, 2013 WL 140455 (N.D. Ill. Jan. 11, 2013).

Simkus filed another lawsuit in this district on March 29, 2011, alleging violations of the Sarbanes-Oxley Act, and disability discrimination. R. 109 ¶ 16. That lawsuit was dismissed for failure to state a claim. *See Simkus v. United Air Lines, Inc.*, No. 11 C 2165, 2012 WL 3133603 (N.D. Ill. July 31, 2012).

Simkus also filed four complaints against United with the U.S. Occupational Safety and Health Administration ("OSHA"), alleging retaliation under the Sarbanes-Oxley Act and other federal statutes. R. 109 ¶ 17. As of the completion of briefing on this motion, the later three of those complaints remained pending. *Id.* (The record does not reveal what happened to Simkus's first OSHA complaint.)

Shortly before Simkus filed his second federal complaint (11 C 2165), he began an EIS leave of absence. That EIS lasted from March 7, 2011 until July 5, 2011. R. 109 ¶ 9. Simkus was again on EIS from August 25, 2011 until June 12, 2012. *Id.*

Simkus alleges that when he returned from EIS on June 12, 2012, United subjected him to a number of adverse employment actions. R. 38 ¶ 21. Simkus alleges that due to this alleged harassment he stopped coming to work on August 14, 2012 and went on another EIS leave of absence effective September 13, 2012. R. 109 ¶ 74. He has not returned to work since. *Id.*

Simkus filed the discrimination charge with the EEOC that precipitated this case on December 4, 2012. *Id.* ¶ 18. He received a right to sue letter from the EEOC on March 15, 2013, R. 1 at 10, and filed this case on June 13, 2013. R. 1. The operative complaint includes claims for both discrimination and retaliation under the Americans with Disabilities Act.

## Analysis

### I. Adverse Actions

To prevail on either a discrimination claim or a retaliation claim under the Americans with Disabilities Act, a plaintiff must allege that his employer subjected him to "adverse actions." *See Dickerson v. Bd. of Trustees of Comm. College Dist No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). In the employment context, federal law "does not protect against petty slights, minor annoyances, and bad manners." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016). Rather, an "employee must suffer something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* at 918-19. "For example, a materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

5

diminished material responsibilities, or other indices that might be unique to a particular situation." *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013). But "not everything that makes an employee unhappy is an actionable adverse action." *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012).

Simkus alleges a litany of adverse actions. United argues that there is insufficient evidence for a reasonable jury to conclude that any of Simkus's experiences constitute adverse actions.[1] The Court agrees.

### 1. Parking Privileges

Simkus alleges that United "revoked" his "parking privileges" upon his return from EIS. R. 38 ¶ 21a. But Simkus testified that although he did not "immediately" receive a parking pass, he did receive it "eventually." R. 110-1 at 26 (140:2-7). No reasonable juror could find that a delay in issuing a parking pass—a delay that was necessarily no longer than the two months that Simkus reported to work before again taking EIS—constitutes an adverse action. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (being denied a parking permit for four days is not an adverse action).

### 2. FAA Badge & Background Check

Simkus alleges that United took an adverse action against him by "[i]ntentionally delaying and failing to complete the required City of Chicago FAA

---

[1] United also argues that Simkus's claims are "inextricably entwined with his collective bargaining agreement, and therefore [are] preempted by the [Railroad Labor Act]," such that the Court lacks subject matter jurisdiction. R. 108 at 15. The Court rejected this argument in denying United's motion to dismiss. United has not cited any facts or new arguments that change the Court's analysis on this issue.

badge application." R. 38 ¶ 21b. He also alleges that United "refus[ed] to escort [him] to the [proper] department [at O'Hare Airport] to obtain papers necessary for [him] to have a background check completed," which also was necessary to receive the badge. *Id.* ¶ 21c. But Simkus testified that United employee Greg Wheeler agreed to meet Simkus to take him for a background check and sign his badge application, but Simkus missed his appointment with Wheeler because he was 15 minutes late. R. 110-1 at 20 (116:7–117:20). Despite this, Wheeler signed Simkus's badge application the day after Simkus initiated the badge application process. R. 110-1 at 18 (106:16-20), 20 (117:14-16). Simkus's testimony is contrary to his allegations and cannot support his claim that United delayed in processing his badge renewal application.

### 3. Study Guide & Failing the Driver's Test

Simkus alleges that United "[r]efus[ed] to provide [him] with a study guide for the [written] drivers' test" that was necessary to renew his FAA badge. R. 38 ¶ 21d. Simkus testified that he was supposed to receive a study guide with his application form, but he was told that none were available and they had to be "preauthorized." R. 110-1 at 11 (66:16–67:5). Simkus also alleges that United caused him to fail the driver's test the first time he took it because United delayed in signing Simkus's application and that delay caused him to have to "rush" to the test. R. 38 ¶ 21e. Considering the fact that Simkus was permitted to retake the driver's test one day later and he passed, R. 110-1 at 24 (130:9-12), no reasonable

7

juror would consider either the failure to provide a study guide or causing Simkus to "rush" to be adverse actions.

4. **"Time Tracker" System**

Simkus testified that when he returned from EIS he was not given access to United's "Time Tracker" system, which allowed employees to verify the number of hours they had worked and confirm that their paycheck was correct. But Time Tracker records show that Simkus accessed Time Tracker several times before he went on EIS again. *See* R. 110-22 at 4-5 (¶¶ 16-17). Simkus's access of Time Tracker is further confirmed because a fingerprint scan is necessary to access the system. *Id.* at 4 (¶ 13). Moreover, even if Simkus was not given access to Time Tracker, he could have requested that United generate a hard copy report of his hours. *Id.* at 3 (¶ 9). Not being able to review his hours online is a mere inconvenience that does not amount to an adverse action.

5. **Manpower Program**

Simkus also alleges that United took an adverse action against him by "blocking" his access to the "Manpower Program" which allows United employees to request time off and sick days, trade shifts, and sign up for overtime. R. 38 ¶ 21g. But Simkus testified that he was able to work overtime and request time off during the relevant time period. *See* R. 110-1 at 35 (177:2-24). Thus, to the extent he was not able to access the "Manpower Program," it only inconvenienced his ability to work overtime or take time off, and this inconvenience does not constitute an adverse action.

8

### 6. Uniform & Locker

Before he went on EIS from August 25, 2011 until June 12, 2012, Simkus was fitted for a new safety uniform known as an "Arc Flash" uniform. When Simkus went on EIS, United assigned his Arc Flash uniform to an active employee because United did not keep uniforms for inactive employees due to cost. R. 110-21 at 4 (¶ 9); R. 110-1 at 29 (151:21-22), 31 (158:7-14). When Simkus returned from EIS, no Arc Flash uniforms were available, so Simkus was again fitted for an Arc Flash uniform. R. 110-1 at 29 (153:8-13), 30 (154:2-6). That uniform was not delivered until after Simkus again went on EIS. While he was waiting for delivery of a new Arc Flash uniform, Simkus was permitted to wear an old uniform and did not suffer any consequences for doing so. R. 110-1 at 30 (155:12-14). Even if Simkus was "unfair[ly] reprimand[ed]" for not wearing a uniform United failed to provide, such reprimands are not adverse actions if they are "unaccompanied by tangible job consequences." *Boss*, 816 F.3d at 919.

Simkus also alleges that he was denied access to a locker. However, lockers were not provided for employees, but to store the Arc Flash uniforms United owned. R. 110-24 at 3 (¶ 6). These circumstances also do not constitute an adverse action.

### 7. Badge & Website Photos

Simkus alleges that United failed to take his photo so that he could receive a new "CO-AIR" badge after United merged with Continental Airlines, R. 38 ¶ 21j, and that his website photo was incorrect. *Id.* ¶ 21k. Simkus testified that he learned about these issues in 2011. R. 110-1 at 32 (163:10-18, 165:19-22). In order for these

9

complaints to be actionable, Simkus was required to file a charge with the EEOC within 300 days of learning about them. *See Stepney v. Naperville Sch. Dist.*, 203, 392 F.3d 236, 239 (7th Cir. 2004). Simkus waited to file his EEOC charge until December 4, 2012, well over 300 days after he was aware of the problems with his badge and website photos, making any claim based on these issues barred by the statute of limitations. In any case, an incorrect website photo and delay in receiving a badge photo, without evidence of serious consequences (which Simkus has not produced) are mere inconveniences that do not rise to the level of adverse actions.

### 8. Less Desirable Jobs, Non-Lead Work & Taking Breaks Outside the Work Area

Simkus alleges that he was assigned to "the most unfavorable work areas . . . [and] assignments" even though those "[l]ess desirable jobs were typically assigned to the least senior mechanics." R. 38 ¶ 21l. But Simkus testified that during the relevant period, he worked as the lead mechanic on his shift—meaning he was responsible for assigning duties—14 times. R. 110-1 at 10 (59:14–60:15); *see also* R. 110-5. The fact that Simkus was assigned to be the lead mechanic on a somewhat regular basis belies his allegation that he was assigned "the most unfavorable work."

Simkus also alleges that he was "[f]orc[ed] to do non-lead work duties on days when he was, in fact, working as a lead despite the fact that no other leads were ever assigned to do non-lead duties." R. 38 ¶ 21o. Simkus testified that his supervisors told him that although lead mechanics used to be expected to coordinate assignments from behind a desk, United's policy had changed by the time Simkus

10

returned from EIS such that lead mechanics were also expected to work in the field in addition to coordinating assignments. R. 110-1 at 45 (216:9-21). Simkus testified, however, that other mechanics told him the supervisors were lying and that the policy was not enforced against other employees when they served as lead mechanic. *Id.* (216:22–217:5). Other than these hearsay statements, Simkus has not presented any evidence (such as deposition testimony or affidavits) showing that other lead mechanics were not also required to work in the field. *Id.* at 45-46 (217:24–218:17). Regardless of whether there was such a policy change, Simkus was never asked to do any tasks that were not part of his job description. R. 110-1 at 5 (37:13–38:1). These circumstances evince mere "alterations of job responsibilities" and do not constitute an adverse action.

Simkus also alleges that he was "[s]ingl[ed] out and harass[ed] [because he took] work breaks outside of his work area, despite the fact that he was not out of his work area and not other mechanics were subjected to scrutiny as to where they took their [breaks]." R. 38 ¶ 21n. At his deposition, Simkus identified one occasion when his supervisor accused him of taking a break outside his work area. R. 110-1 at 48 (227:2–228:12). Simkus testified that he was not disciplined as a result of the accusation. *Id.* (227:24–228:5). This sort of circumstance does not amount to an adverse action. *See Boss*, 816 F.3d at 919 ("Unfair reprimands . . . unaccompanied by tangible job consequences, do not suffice . . . .").

### 9. Injury Time

Simkus alleges that when he returned from EIS in June 2012, his pay stub showed that his accumulated occupational injury time had been "deleted." R. 38 ¶ 21m. Specifically, Simkus testified that his time card from February 14, 2012 showed he had accumulated 280 hours, whereas his time card from June 28, 2012 showed an accumulation of only eight hours. R. 110-1 at 27 (144:14-17). Simkus also testified, however, that he never sought to use any of his occupational injury hours, so the deletion did not cause him any harm, *id.* at 27 (145:13-15), and that his hours were reinstated. *Id.* at 30 (157:8-17). A United employee familiar with United's procedures for recording injury time states that when United converted to a new payroll system in September 2011, some employees on EIS did not have have their injury time converted to the new system, and corrections had to be made manually. R. 110-16 ¶¶ 4-5. The evidence in the record reflects that the deletion of Simkus's injury hours was inadvertent, and that Simkus was not harmed by the temporary deletion. Moreover, because his hours were reinstated when he noticed the discrepancy, these circumstances cannot constitute an adverse action.

### 10. Access to "Leads Desk Terminal"

Simkus alleges that on three occasions his profile and passwords for the computer program used by lead mechanics was deleted by other mechanics working on the prior shift. R. 38 ¶¶ 21p-21q. Simkus testified, however, that even when he could not access the program, he was still able to do his job, and lacking access to the program was "just a matter of inconvenience" and a "hassle." R. 110-1 at 48

(226:19-24). Simkus also testified that his access was restored soon after it was deleted. *Id.* at 47 (222:7-10). These "inconveniences" do not constitute an adverse action.

### 11. Holiday Pay

Simkus alleges he was paid incorrectly for work he performed over the July 4, 2012 holiday. R. 38 ¶ 21r. Simkus testified, however, that his pay was corrected when he brought the error to United's attention. R. 110-1 at 37 (183:23–184:6). United's records show that the check correcting Simkus's pay was cut only eight days after the pay check that should have included the extra pay for July 4, 2012. *See* R. 110-16 ¶¶ 2-3; *id.* at 9, 11. An error in compensation that is corrected in little more than a week is not an adverse action.

### 12. Long Term Disability

Simkus alleges that United took an adverse action against him when it failed to provide information to MetLife—the administrator of United's' long term disability plan—in a timely fashion. Simkus testified, however, that he was able to apply for and did receive long term disability benefits, albeit with some delays. R. 110-1 at 41 (201:7-9). Correspondence from MetLife to Simkus dated December 20, 2011, January 23, 2012, and May 8, 2012 also shows that Simkus was the cause of a portion of the delay in that he failed to provide MetLife with the documentation necessary to process his claim. R. 109 ¶¶ 66-67 (and exhibits cited therein). On that basis, MetLife closed his claim on May 8, 2012. *Id.* ¶ 67. Considering that Simkus ultimately received the long term disability benefits he was owed, and the fact that

Simkus was partially responsible for the delay in receiving those benefits, these circumstances do not constitute an adverse action.

## II.   Hostile Work Environment & Constructive Discharge

In his opposition to United's motion, Simkus asks the Court for leave to amend his complaint to include a hostile work environment and/or constructive discharge claim. *See* R. 114.[2] "While leave to amend a complaint should be freely granted when justice so requires, Fed. R. Civ. P. 15(a)(2), a district court may properly deny leave for a variety of reasons, including undue prejudice or futility." *Kuhn v. United Airlines, Inc.*, 640 Fed. App'x 534, 536-37 (7th Cir. 2016). "Amendment is futile if the added claim would not survive a motion to dismiss or a motion for summary judgment." *Id.* at 537. "Additionally, to amend a pleading after the expiration of the trial court's scheduling order deadline to amend pleadings, the moving party must show 'good cause.'" *Id.* The decision whether to grant leave to amend is within the district court's discretion. *Id.*

Simkus cannot established "good cause." Discovery closed more than a year ago on July 28, 2015. R. 98. The core facts of this case have not changed since Simkus filed it more than three years ago. If Simkus believed he suffered from a hostile work environment or constructive discharge he should have sought leave to amend his complaint at some earlier point in the litigation. To allow an amendment

---

[2] Simkus also seeks to amend his complaint to include a claim for intentional infliction of emotional distress. The Court dismissed this claim at the pleading stage, and the evidence discovered since then has only confirmed that Simkus cannot prevail a claim for intentional infliction of emotional distress. Simkus will not be permitted to amend his complaint to include an intentional infliction of emotional distress claim.

14

this at in the case would unduly prejudice United. See Kuhn, 640 Fed. App'x at 537 (affirming the district court's denial of leave to amend where the plaintiff "miss[ed] the scheduling-order deadline to amend the pleadings," "did not seek leave to file her third amended complaint until . . . nearly nine months after the deadline to amend and just days before the close of discovery," and the "proposed amendment was based on long-known events").

Furthermore, the amendment Simkus seeks to make would be futile because it would not survive a motion to dismiss or a motion for summary judgment. To succeed on a hostile work environment claim, a plaintiff must demonstrate that "the environment was both subjectively and objectively offensive," and that the conduct constituting the hostile environment was "severe or pervasive." *Poullard v. McDonald*, 2016 WL 3924375, at *9 (7th Cir. July 21, 2016). A constructive discharge claim requires a showing of "unbearable" working conditions; i.e., evidence of a hostile work environment that has grown so oppressive that the law recognizes it was appropriate for the plaintiff to quit. *Wright v. Ill. Dep't of Children & Fam. Servs.*, 798 F.3d 513, 527 (7th Cir. 2015) ("[S]uch cases require a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit.").

No reasonable juror could find that Simkus was subjected to a hostile work environment, let alone constructive discharge. An "employee's complaints about

transfers, a late overtime payment, his salary, and difficulties with managers" are "normal workplace friction," not actionable harassment. *Poullard*, 2016 WL 3924375, at *10 (citing *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004)); *see also Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (no hostile work environment claim where employee alleged that her supervisor "treated her in a rude, abrupt, and arrogant manner, ignored her work-related suggestions and failed to keep her informed about changes at work"). Although there is evidence that Simkus suffered a number of inconveniences at work, he testified that nearly all of them were temporary, and there is no evidence to show that Simkus suffered "a workplace permeated with discriminatory ridicule, intimidation, and insult," which a hostile work environment requires. *Boss*, 816 F.3d at 921. Rather, the evidence shows that Simkus experienced normal workplace friction and inconveniences, which cannot support a hostile work environment or constructive discharge claim.

## Conclusion

For the foregoing reasons, United's motion for summary judgment, R. 106, is granted.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: September 13, 2016

16